# EXHIBIT A

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
8/10/2026 10:53:34 PM
Clerk of the Superior Court
By P. Neal ,Deputy Clerk

PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and the Proposed Class

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

| | |
|---|---|
| ALICIA SANCHEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUINSTREET, INC., a Delaware corporation, d/b/a HOMEBUDDY.COM,<br><br>Defendant. | **Case No. 26CU027477C**<br><br>***Hon. Katherine A. Bacal***<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR UNLAWFUL SPAMMING AND INVASION OF PRIVACY** |

## I. NATURE OF ACTION

1. This case concerns a commercial data harvesting campaign that masqueraded as newly released veterans' benefits, induced Plaintiff to enter a private advertising funnel, and ultimately delivered her to Defendant's website (HomeBuddy.com).

2. The message claimed (falsely) that it was sent by the Department of Veterans Affairs. It was not. It claimed falsely to relate to veterans benefits. It did not. It was simply for data harvesting.

3. The deception worked. Plaintiff reasonably understood the message as governmental information concerning veterans' benefits, opened it, and followed the embedded link to VETERANDISCOUNTS.LIVE. From there, she followed instructions and was taken to HOMEBUDDY.COM, where Defendant sought her personal information for data harvesting.

4. Defendants' own public materials confirm why that traffic mattered. QuinStreet describes itself as a leader in "performance marketplaces and technologies" and publicly announced that its January 2026 acquisition of HomeBuddy would add "exclusive, high-intent leads, distributed in an auction format" to QuinStreet's home-services platform. QuinStreet paid $115 million at closing, with another $75 million in post-closing payments, and announced that it would integrate HomeBuddy into its Modernize Home Services business. The challenged May 2026 e-mail arrived after that acquisition closed.

5. The HomeBuddy website likewise admits it uses third parties to obtain information for marketing purposes, creates profiles from behavior and personal characteristics, and permits third-party advertisers to track users over time and across websites for targeted advertising and remarketing. HomeBuddy specifically discloses use of Google Analytics, Hotjar, and Heap.

6. Plaintiff therefore brings claims under Business and Professions Code section 17529.5 for materially deceptive header information and a materially deceptive subject line, Penal Code section 638.51 for the non-content routing, addressing, and signaling information captured by website tracking processes, and California common law for intrusion upon seclusion.

## II. PARTIES, JURISDICTION, VENUE, AND DEFENDANT' CALIFORNIA CONDUCT

7. Plaintiff ALICIA SANCHEZ is a citizen and resident of California. She owns and uses the electronic-mail address alisanchez0119@gmail.com. Plaintiff received and opened the challenged

e-mail in California, followed the referral path in California, visited HomeBuddy from a personal device located in San Diego County, and experienced the tracking and privacy invasion alleged below in California.

8. Defendant QUINSTREET, INC. ("QuinStreet") is a Delaware corporation headquartered at 950 Tower Lane, 12th Floor, Foster City, California 94404. Defendant owns and does business as HOMEBUDDY.COM ("HomeBuddy").

9. QuinStreet's California headquarters houses the executive, marketing, finance, legal, technology, and operational functions through which QuinStreet manages its performance-marketing businesses.

10. Specific jurisdiction over Defendant is proper. Plaintiff's claims arise directly from Defendant's California-directed commercial conduct.

11. For the nationwide claims and classes alleged below, California has a substantial relationship to the challenged course of conduct because QuinStreet is headquartered here and material decisions concerning HomeBuddy's post-acquisition lead-acquisition strategy, marketing oversight, analytics, data practices, vendor management, compliance, and monetization were made, approved, implemented, or supervised from California.

12. This Court has subject-matter jurisdiction because it is a court of general jurisdiction.

13. Venue is proper in San Diego County because Plaintiff received the e-mail, opened it, followed the referral chain, visited HomeBuddy, and suffered the statutory and privacy injuries alleged herein in this County.

## III. FACTUAL ALLEGATIONS

**THE MAY 3, 2026 VETERANS-BENEFITS E-MAIL**

14. On May 3, 2026, Plaintiff received the commercial e-mail attached as Exhibit A. The visible display name was "Veterans.Benefits." The subject line stated: **"12 New Veteran Benefits Just Went Public."**

15. The message used American-flag imagery, the heading "Veterans Discounts.live," and the repeated representation "12 New Veteran Benefits Just Went Public." It instructed recipients to

"Review the opportunities that may be available to you," "check eligibility," and "See What You Qualify For."

16. The footer did not identify the actual legal entity that initiated the message. It provided an unsubscribe link and two entirely random location references, but no company name.

17. Plaintiff had no preexisting business relationship with Defendant and had not given direct consent to receive the challenged commercial e-mail advertisement from Defendant or its marketing publishers.

18. Plaintiff opened the message because she believed it concerned official or government-endorsed veterans' benefits. She then clicked the embedded link and was directed to VETERANDISCOUNTS.LIVE, and eventually redirected to Homebuddy.com.

19. The referral path was not accidental. It contained or generated source, campaign, affiliate, click, referral, cookie, or session identifiers used to attribute traffic and determine which publisher, campaign, placement, or creative generated Plaintiff's visit. Such attribution is integral to a performance-marketing business because it permits traffic to be credited, accepted, rejected, priced, optimized, and compensated.

**THE HEADER WAS AN AFFIRMATIVE GOVERNMENTAL IMPERSONATION, NOT A MERE LABELING DEFECT**

20. The e-mail violated Business and Professions Code section 17529.5(a)(2) because the header affirmatively misrepresented the identity and character of the person or entity initiating the message. The visible "From" name was not a neutral marketing label. "Veterans.Benefits" purported to identify the source of the message as an official veterans-benefits source.

21. No governmental department, veterans' benefits agency, or legal entity actually named "Veterans.Benefits" initiated the message. The display name appropriated the language of public benefits administration while concealing the private commercial sender.

22. Nothing in the body identified the actual initiating publisher. "Veterans Discounts.live" identified a website, not the legal person or entity that initiated the e-mail. The two random addresses in the footer likewise did not identify a sender. A recipient therefore could not determine from the

header, body, footer, or ordinary public-source inquiry which private entity actually initiated the message.

23. This is not a case involving a benign or fanciful sender label where the body clearly disclosed the actual commercial sender. Here, the header made an affirmative false-source representation and the body repeated the veterans-government theme rather than correcting it.

24. The misrepresentation was material. Whether a message concerning veterans' benefits comes from a governmental or government-endorsed source, as opposed to an unidentified commercial lead generator, bears directly on credibility, urgency, legitimacy, and whether a reasonable recipient will open the message and follow its instructions. Plaintiff did exactly that.

25. The deception involved traditional falsity and impersonation, not a technical rule requiring a particular corporate name in the "From" line.

**"12 NEW VETERAN BENEFITS JUST WENT PUBLIC" WAS MATERIALLY FALSE**

26. The e-mail independently violated section 17529.5(a)(3). The subject line **"12 New Veteran Benefits Just Went Public"** communicated at least three concrete facts before the e-mail was opened: that there were twelve identifiable benefits; that those benefits were veterans' benefits; and that they had newly or recently become public. ***All three were literally false.***

27. Those representations did not describe the message Plaintiff actually received. The body did not announce twelve newly public veterans' programs. It advertised generic commercial categories that were used for data harvesting that had nothing to do with veterans or benefits.

28. The home-services offer that led Plaintiff to HomeBuddy was not a benefit created for veterans, was not administered by the Department of Veterans Affairs or any governmental body, and was not conditioned on veteran status. It was a general-market request for a commercial home-improvement service.

29. The statement that the benefits "Just Went Public" was likewise material. It communicated novelty and urgency: that information concerning newly released benefits had only recently become publicly available and therefore warranted immediate attention. The underlying commercial offers were evergreen lead-generation offers marketed before May 3, 2026 and did not "just" become public.

**DEFENDANT ADVERTISED IN AND MONETIZED THE REFERRAL FUNNEL**

30. The e-mail was a "commercial e-mail advertisement" because its primary purpose was to promote private goods and services and generate commercially valuable consumer traffic and leads. The body expressly offered "Insurance or Financial Services" and "Home Services or Household Savings," and Plaintiff's home-services selection led to HomeBuddy.

31. HomeBuddy's own contractor Terms describe its business as providing commercial "Leads," defined as unique requests for quotes for home-improvement services, and appointments between consumers and contractors. The challenged funnel delivered Plaintiff into precisely that lead-generation function.

32. QuinStreet's public acquisition announcement provides additional context. QuinStreet described HomeBuddy as a "digital marketplace platform that matches homeowners with the most appropriate home services professional" and stated that HomeBuddy would add "exclusive, high-intent leads, distributed in an auction format" to QuinStreet's Modernize Home Services business.

33. These admissions matter because they show that consumer referrals are not incidental to Defendant's business; they are the product of the business. A visitor routed from a publisher through a tracked campaign into HomeBuddy has commercial value because Defendant can convert the inquiry into a lead, appointment, or monetizable contractor opportunity.

34. The intermediate VETERANDISCOUNTS.LIVE page reinforces Defendant's liability. The campaign was structured as a multi-step funnel: the e-mail generated the click, the intermediate page categorized the consumer's interest, and the home-services selection delivered the consumer to HomeBuddy.

35. Defendant received, retained, recognized, and was capable of recognizing the source and campaign identifiers associated with Plaintiff's referral and used those identifiers to attribute the traffic to the publisher or campaign responsible for generating the lead.

36. HomeBuddy did not accept anonymous traffic without commercial attribution. Its business model requires source and lead-quality information so that publishers, campaigns, traffic sources, contractors, and leads can be measured, optimized, priced, credited, or compensated.

**THE CLAIMS ARE BASED ON MATERIAL DECEPTION AND ARE NOT PREEMPTED**

37. The anti-spam claim is not an attempt to impose a technical labeling rule more stringent than federal law. This was classic deception: the message impersonated a governmental veterans-benefits source, concealed the private commercial initiator, and announced newly public veterans' benefits that did not exist as represented.

38. Those misrepresentations were material because they affected whether Plaintiff would open the message, trust it, and follow the referral path. The California statute is being applied here to prohibit falsity and deception of the kind preserved by the CAN-SPAM Act's express savings clause.

39. The deception also bears the hallmarks of traditionally tortious conduct. A private commercial actor falsely appropriated the apparent identity and authority of a governmental veterans-benefits source to induce action. Plaintiff does not seek statutory damages merely because a domain was difficult to trace; she seeks relief because the header and subject line communicated materially false facts about source and content.

**HOMEBUDDY'S TRACKING TECHNOLOGIES AND ITS OWN PRIVACY ADMISSIONS**

40. After Plaintiff was delivered to HomeBuddy, the website caused Plaintiff's browser to communicate with third-party analytics, advertising, and behavior-measurement services. These communications occurred because code selected and embedded by HomeBuddy executed in Plaintiff's browser; Plaintiff did not independently navigate to those third parties.

41. HomeBuddy's own Privacy Policy admits extensive automated collection. HomeBuddy states that it collects IP addresses, device unique identifiers, browser characteristics, device characteristics, operating system, referral websites, actions taken on the site, dates and times of visits, and pages accessed.

42. HomeBuddy further admits that third parties may collect information through its website using cookies, plug-ins, widgets, and other technologies to deliver targeted advertising across the Internet, advertise other products and services, and analyze a visitor's interactions with HomeBuddy and other websites.

43. HomeBuddy expressly states that it combines automated information with other personal information to "create a profile" of the user and create categories of individuals targeted with offers and promotions by e-mail, online advertising, or social media.

44. HomeBuddy's targeted-advertising disclosure is even more explicit: third-party advertisers "track your online activities over time and across websites and mobile applications" using third-party cookies, web-server logs, and web beacons, and use the resulting information to tailor advertisements to individual interests.

45. HomeBuddy's California privacy notice states that identifiers — including IP addresses, e-mail addresses, telephone numbers, and unique online identifiers — are obtained automatically from pixels or cookies and shared with categories including affiliates, consumer data resellers, advertising networks, data analytics providers, operating systems and platforms, e-mail distribution services, and website developers. It similarly identifies browsing and search history and website/ad interaction information as collected automatically from pixels or cookies.

46. HomeBuddy specifically discloses use of Google Analytics, Hotjar, and Heap. Those technologies are capable of receiving non-content identifiers and behavioral data generated by a browser. Google Analytics uses first-party cookies, device/browser data, IP-derived information during collection, and on-site activity. Hotjar records interactions such as clicks, scrolling, mouse movement, and page transitions and assigns a unique user identifier. Heap collects data including IP address, browser identifiers, referral/campaign URLs, clickstream activity, webpages visited, clicks, device/browser information, and related behavioral data.

47. Defendant captured specific non-content routing, addressing, and signaling information transmitted in the challenged requests — such as IP address or other network-routing information, persistent cookie/device identifiers, browser or session identifiers, source/referrer identifiers, destination host or endpoint, timestamps, and similar source-identifying signals.

48. Those identifiers are reasonably likely to identify the source of an electronic communication because they identify or distinguish the originating browser, device, network connection, session, campaign source, or returning visitor. Persistent identifiers permit a third party to recognize the same browser or device across requests and, in some implementations, across sessions.

49. Defendant did not obtain a court order authorizing installation or use of the alleged trap-and-trace processes.

**THE TRACKING WAS AN OFFENSIVE INTRUSION IN CONTEXT**

50. Plaintiff's intrusion claim is not based on the mere fact that a website necessarily receives an IP address to deliver a requested page. It is based on Defendant causing Plaintiff's browser to communicate with separate third parties for analytics, profiling, attribution, targeted advertising, or related commercial purposes before Plaintiff gave valid consent.

51. The intrusion is materially different from a store clerk benignly observing a shopper in a store. The challenged code operates invisibly on a personal device, can assign persistent identifiers, transmits data to entities the visitor did not choose to visit, and can permit activity to be correlated over time or with information obtained from other sources.

52. The circumstances are particularly offensive because Plaintiff did not arrive at HomeBuddy through an ordinary voluntary search. She was induced there through a message that falsely presented a commercial lead-generation funnel as newly public veterans' benefits. The same deception that procured the visit deprived Plaintiff of a meaningful opportunity to decide whether to expose her device and session to the third-party tracking ecosystem awaiting her at the destination.

53. HomeBuddy's own disclosures establish that this was not merely page-performance measurement. HomeBuddy acknowledges profiling, targeted advertising, tracking across websites and applications, and disclosure of identifiers and network activity to consumer data resellers and advertising networks. Those admitted commercial uses materially exceed the technical transmission required to deliver a webpage.

54. Plaintiff had a reasonable expectation that, before she affirmatively consented, her personal device would not be used as a conduit to disclose persistent identifiers, referral information, browsing interactions, and source-identifying signals to third-party analytics, advertising, or data-market participants for commercial exploitation.

55. The intrusion caused loss of privacy and control over information emitted by Plaintiff's device, unwanted disclosure to third parties, use of device and network resources, and the indignity and

interference associated with undisclosed commercial surveillance initiated through a deceptively procured visit.

## IV. CLASS ACTION ALLEGATIONS

56. Plaintiff brings this action under Code of Civil Procedure section 382 on behalf of herself and all others similarly situated.

57. Plaintiff seeks certification of the following Nationwide Email Class:

**All persons in the United States who, during the applicable limitations period, received a commercial e-mail in the same or substantially similar "Veterans Benefits" campaign alleged herein that was sent from California or to a California e-mail address as defined by statute and that directed recipients to HomeBuddy.com.**

58. Plaintiff seeks certification of the following Nationwide Tracking Class:

**All persons in the United States who, during the applicable limitations period, visited the same HomeBuddy page or pages at issue and, before affirmative consent to nonessential third-party tracking, had their browsers transmit to the same third-party tracking technologies the same categories of persistent identifiers, routing, addressing, signaling, referral, device, session, or browsing information alleged herein.**

59. Excluded from the Classes are Defendant; their officers, directors, and employees; any judge assigned to this action and that judge's immediate family and staff; and any partner or employee of Class Counsel.

60. Numerosity. Defendant operates a high-volume performance-marketing and lead-generation business. The challenged campaign and web code were standardized and capable of reaching large numbers of consumers. The precise number of Class members is ascertainable from e-mail-send records, affiliate records, campaign identifiers, click logs, server records, consent-management records, analytics, and third-party vendor data.

61. Commonality and Predominance. Common questions include whether "Veterans.Benefits" falsely represented the source of the message; whether the actual initiator was disclosed; whether "12 New Veteran Benefits Just Went Public" materially misrepresented the message; whether the campaign was sent from California; whether Defendant advertised in or commercially


EXHIBIT A
PAGE 20

benefited from the funnel; which tracking technologies executed; what data fields were transmitted; whether transmission preceded consent; whether the non-content fields qualify as routing, addressing, or signaling information; and whether the standardized tracking conduct was highly offensive.

62. Typicality. Plaintiff received the standardized campaign e-mail, followed the same commercial referral path, visited a HomeBuddy page, and was exposed to the same centrally deployed tracking architecture as members of the proposed Classes.

63. Adequacy. Plaintiff will fairly and adequately protect the interests of the Classes. She has no interests antagonistic to absent members and has retained counsel experienced in complex consumer, privacy, and class litigation.

64. Superiority. A class action is superior because the challenged practices are standardized, Defendant and its vendors possess the records necessary to identify class membership and resolve the central liability questions, and individual statutory and privacy claims are comparatively modest.

65. Ascertainability. Membership can be determined objectively from campaign templates, sender/display-name records, subject-line records, destination and redirect URLs, source/campaign identifiers, e-mail delivery records, HomeBuddy lead-source records, web-server logs, consent-management records, analytics records, and third-party vendor logs.

66. Choice of Law. California law may constitutionally govern the Nationwide Classes because QuinStreet is headquartered in California and the challenged post-acquisition policies and practices concerning marketing oversight, traffic acquisition, analytics, compliance, vendor management, and monetization were centrally made, approved, or supervised in California.

## V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of Cal. Business & Professions Code § 17529.5(a)(2) and (a)(3)

67. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

68. The May 3, 2026 message was a "commercial e-mail advertisement" because its primary purpose was to advertise and promote private commercial goods and services, including home-services leads that ultimately directed Plaintiff to HomeBuddy.

69. Plaintiff received the message at a California electronic-mail address. The standardized campaign was sent from California within the meaning of section 17529.5(a), subject to confirmation from raw headers, SMTP records, publisher records, and discovery.

70. The message violated section 17529.5(a)(2) because its header contained materially falsified and misrepresented source information. "Veterans.Benefits" affirmatively conveyed a governmental or government-endorsed veterans-benefits source while concealing the actual private commercial initiator, and neither the body nor footer identified that initiator.

71. The message violated section 17529.5(a)(3) because the subject line "12 New Veteran Benefits Just Went Public" was known to be likely to mislead a reasonable recipient about material facts concerning the content and subject matter of the message. The message did not provide twelve newly public veterans' benefits; it promoted ordinary private commercial offers, including a general-market home-services lead.

72. The header and subject-line misrepresentations were material and traditionally deceptive. They concerned who was speaking, whether the communication was governmental or government-endorsed, whether the offers were veterans' benefits, and whether they had newly become public. Plaintiff opened and acted upon the message because of those representations.

73. The claims fall within CAN-SPAM's savings clause because they seek to remedy material falsity and deception, not merely nonuniform technical labeling requirements.

74. Defendant has not established and implemented, with due care, practices and procedures reasonably designed to prevent commercial e-mail advertisements promoting their businesses from containing materially deceptive header information or subject lines, or any such procedures were ineffective as applied to the campaign alleged here.

75. Plaintiff and members of the statutory Classes are entitled to the remedies authorized by section 17529.5, including liquidated damages, reasonable attorneys' fees and costs, and appropriate injunctive or equitable relief.

## SECOND CAUSE OF ACTION

### Violation of Cal. Penal Code § 638.51

76. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

77. Penal Code section 638.50(c) defines a trap-and-trace device as a "device or process" that captures incoming electronic or other impulses identifying an originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication.

78. The statutory definition expressly reaches a "process" and an "electronic communication." Plaintiff alleges that the tracking processes described above captured non-content source-identifying signals generated by her browser, including the specific routing, addressing, and signaling fields established by the technical evidence.

79. Defendant intentionally installed, configured, or used those processes by embedding or causing third-party code to execute on HomeBuddy.com to initiate communications from visitors' browsers to third-party endpoints.

80. The challenged process captured or transmitted, as established by the technical evidence, IP/network-routing information, persistent cookie or device identifiers, browser or session identifiers, source/referrer identifiers, destination information, timestamps, and other non-content addressing or signaling information reasonably likely to identify the source of electronic communications.

81. Plaintiff does not premise this cause of action on the collection of browsing contents, form contents, or the substantive content of communications. To the extent the same technologies also collect content for other purposes, that additional capability does not eliminate the distinct capture of non-content source-identifying signals challenged here.

82. The challenged capture occurred automatically and before valid affirmative consent. Defendant did not obtain a court order authorizing installation or use of the alleged trap-and-trace processes.

83. Plaintiff seeks relief for the Nationwide Tracking Class to the extent the challenged processes were installed, configured, or used from California or California law otherwise governs the conduct.

84. Penal Code section 637.2 provides a civil remedy for violations of CIPA. Plaintiff and the applicable Tracking Class members seek statutory damages and other relief permitted by law.

**THIRD CAUSE OF ACTION**

**California Common-Law Intrusion Upon Seclusion**

85. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

86. Defendant intentionally intruded into Plaintiff's and Class members' private devices and browsing sessions by causing embedded third-party code to access and transmit persistent identifiers, routing/referral information, session information, browsing behavior, and other specified data to third parties without valid prior consent.

87. Plaintiff had a reasonable expectation of privacy in the undisclosed third-party transmission of persistent identifiers and browsing/session information from her personal device before she affirmatively consented to nonessential tracking, particularly where the transmissions were made to analytics, advertising, profiling, or data-market participants rather than being necessary to deliver the requested page.

88. The intrusion was highly offensive in context because it involved invisible third-party code, automatic pre-consent transmission, persistent identification, commercial profiling and targeted-advertising uses, disclosure to categories including consumer data resellers and advertising networks, and a visit procured through materially deceptive veterans-benefits advertising.

89. Defendant's own privacy disclosures recognize that the information collected through pixels or cookies can include identifiers, network activity, referral sources, website interactions, profiles and inferences, and that third-party advertisers may track visitors over time and across websites and applications. The challenged practices therefore cannot be reduced to the unavoidable technical receipt of an IP address by the website a consumer intentionally visits.

90. Plaintiff personally experienced the intrusion on her own device and suffered loss of privacy and control over information emitted from that device, unwanted disclosure to third parties, consumption of device and network resources, and the interference associated with undisclosed commercial surveillance of her browsing activity.

91. Defendant's conduct was intentional and undertaken for commercial benefit. To the extent discovery establishes malice, oppression, or fraud within Civil Code section 3294, Plaintiff seeks punitive damages on behalf of herself and, where legally permissible, the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendant as follows:

a. For an order certifying the Nationwide Email Class and Nationwide Tracking Class, or alternatively the California Email and Tracking Subclasses, appointing Plaintiff as Class Representative, and appointing undersigned counsel as Class Counsel;

b. For statutory and liquidated damages available under Business and Professions Code section 17529.5;

c. For statutory damages available under Penal Code section 637.2 for each proven violation of section 638.51;

d. For compensatory, nominal, and other damages available on the intrusion-upon-seclusion claim;

e. For punitive damages to the extent authorized by Civil Code section 3294 and proven at trial;

f. For declaratory and injunctive relief prohibiting materially deceptive e-mail campaigns and unlawful pre-consent third-party tracking;

g. For reasonable attorneys' fees and costs where authorized by law;

h. For prejudgment and post-judgment interest as allowed by law; and

i. For such other and further relief as the Court deems just and proper.

Dated: August 9, 2026

PACIFIC TRIAL ATTORNEYS, APC

By: ______________________________
Scott J. Ferrell
Attorneys for Plaintiff and the Proposed Class

# EXHIBIT A

From: **Veterans.Benefits** <ndahwujtbzi@niww.oivkjuznhgdaf.us>
Date: Sun, May 3, 2026 at 8:22 AM
Subject: 12 New Veteran Benefits Just Went Public
To: <alisanchez0119@gmail.com>

us★★★us Veterans us
Discounts.live

# 12 New Veteran Benefits Just Went Public

But Most Don't Know About Them

Get Started

How It Works

| | | | |
|---|---|---|---|
| 1. Review the opportunities that may be available to you.us | 2. Click on an offer that interests you. | 3. Answer a few quick questions to check eligibility.us | 4. If you qualify, enjoy your discount!us |

See If You Qualify For...

Insurance or Financial Services Home Services or Household Savings Discounts for the Family

See What You Qualify For

click here to unsubscribe.

99 Wall Street #1154 New York NY 10005
San Diego, CA 92103

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 4100 Newport Place Drive, Suite 800, Newport Beach, CA 92660.

On August 9, 2026, I served the foregoing document described as **FIRST AMENDED CLASS ACTION COMPLAINT FOR UNLAWFUL SPAMMING AND INVASION OF PRIVACY** on the following person(s) in the manner indicated:

**SEE ATTACHED SERVICE LIST**

☐ (BY MAIL) I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope, with postage fully prepaid, addressed as set forth herein, and such envelope was placed for collection and mailing at Pacific Trial Attorneys, Newport Beach, California, following ordinary business practices.

☐ (BY OVERNIGHT FEDERAL EXPRESS) I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for delivery by overnight courier. Correspondence so collected and processed is deposited in a box or other facility regularly maintained by Federal Express that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope designated by Federal Express with delivery fees paid or provided for, addressed as set forth herein, and such envelope was placed for delivery by Federal Express at Pacific Trial Attorneys, Newport Beach, California, following ordinary business practices.

☐ (BY HAND DELIVERY) I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for hand delivery by courier. I caused such document t be delivered by hand to the addresse(s) designated.

☐ **(**BY ELECTRONIC SERVICE) My electronic service address is __________________@pacifictrialattorneys.com. I am electronically serving the document described above and a copy of this declaration to the person, on the date shown below, to the email addresses of the persons listed in the attached service list.

☒ **(**BY ELECTRONIC SERVICE via USA Legal) I am electronically serving the document described above and a copy of this declaration to the person, on the date shown below, to the email addresses of the persons listed in the attached service list. I am readily familiar with the business' practice for filing electronically, and that the document would be electronically served the same day in the ordinary course of business following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on August 9, 2026, at Newport Beach, California.

________________________
Mandy K. Jung

**SERVICE LIST**

| | |
|---|---|
| KELLEY DRYE & WARREN LLP<br>Rebecca B. Durrant (SBN 350444)<br>12481 High Bluff Drive, Suite 240<br>San Diego, CA 92130<br>Telephone: (858) 314-5367<br>Facsimile: (213) 547-4901<br>rdurrant@kelleydrye.com | Attorneys for Defendant<br>QUINSTREET, INC., a Delaware corporation<br>d/b/a HOMEBUDDY.COM, |